**OAKVILLE COMPANY**

v.

**UNITED STATES.**

**C.D. 2893; Protest 63/15731.**

United States Customs Court,
Third Division.

Feb. 14, 1967.

Brooks & Brooks, New York City (Thomas J. McKenna, New York City, of counsel), for plaintiff.

Barefoot Sanders, Asst. Atty. Gen. (Andrew P. Vance and James S. O'Kelly, New York City, trial attys.), for defendant.

Before RICHARDSON and LANDIS, Judges.

LANDIS, Judge.

The merchandise under protest herein involves common pins manufactured in the United States and shipped in bulk to Canada where they were packaged in lots of 5,000 pins on a paper tape, wound onto a wooden core forming a wheel-like roll, with two cardboard side discs stapled to the wooden core.

The pins on rolls (represented by exhibit 1) were thereafter returned to the United States and entered as duty-free merchandise under paragraph 1615(a) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (T.D. 49646).

The collector of customs, however, rejected the duty-free claim and classified the merchandise as common pins under paragraph 350 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade (T.D. 51802). Duty was assessed at the rate of 20 per centum ad valorem.

In its original protest, plaintiff claimed that the pins were entitled to duty-free entry under paragraph 1615(a) of the same act, as amended, supra, as American goods returned without having been advanced in value or improved in condition; that the paper tape was dutiable under paragraph 1615(g) (1), as amended by the Customs Simplification Act of 1954 (T.D. 53599), to the extent of the cost of the alterations performed in Canada on said paper; that the wooden spools were dutiable at 12½ or 16⅔ per centum ad valorem under paragraph 412; and that the cardboard discs were properly classifiable under paragraph 1413 with duty at 15 per centum ad valorem.

By amendment to the above protest, plaintiff further claimed that the wooden spools, paper tape, and cardboard discs constitute the usual and ordinary containers for the imported pins and, as such, were entitled to duty-free entry as the usual containers of duty-free merchandise. Plaintiff also claimed that if said wooden spools, paper tape, and cardboard discs were not free of duty as above claimed, then the failure of the appraiser to return separate values for each of the above components, as well as for the pins, rendered the appraisement and the liquidation herein *per se* null and void.

Counsel for the parties stipulated at the trial, with the approval of the court, that the requirements of the customs regulations pertaining to free entry under paragraph 1615 had been complied with, leaving the issue of whether the pins on rolls herein are entitled to duty-free entry under paragraph 1615, supra, as American goods returned, without having been advanced in value or improved in condition.

The pertinent provisions of the Tariff Act of 1930 are as follows:

Paragraph 350, as modified by T.D. 51802, provides in part:

Pins with solid heads, without ornamentation, including hair, safety, hat, bonnet, and shawl pins; * * * all the foregoing not plated with gold or silver, and not commonly known as jewelry:

  *    *    *    *    *    *

Other .............. 20% ad val.

Paragraph 1615, as amended by the Customs Administrative Act of 1938, supra, provides:

(a) Articles, the growth, produce, or manufacture of the United States, when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means.

  *    *    *    *    *    *

(g) Any article exported from the United States for repairs or alterations

may be returned upon the payment of a duty upon the value of the repairs or alterations at the rate or rates which would apply to the article itself in its repaired or altered condition if not within the purview of this subparagraph.

Paragraph 1615(g), as further amended by the Customs Simplification Act of 1954, supra, provides:

(g) (1) Any article exported from the United States for repairs or alterations may be returned upon the payment of a duty upon the value of the repairs or alterations at the rate or rates which would apply to the article itself in its repaired or altered condition if not within the purview of this subparagraph * * *.

(A) If any article of metal (except precious metal) manufactured in the United States or subjected to a process of manufacture in the United States is exported for further processing; and

(B) the exported article as processed outside the United States, or the article which results from the processing outside the United States, as the case may be, is returned to the United States for further processing,

then such article may be returned upon the payment of a duty upon the value of such *processing* outside the United States at the rate or rates which would apply to such article itself if it were not within the purview of this subparagraph (g). [Emphasis added.]

\* \* \* \* \* \*

(4) For the purposes of this subparagraph (g), the value of repairs, alterations, or processing outside the United States shall be * * *—

(A) the cost to the importer of such repairs, alterations, or processing; or

(B) if no charge is made, the value of such repairs, alterations, or processing,

as set out in the invoices and entry papers * * *.

The record is comprised of the testimony of two witnesses for the plaintiff and three plaintiff's exhibits. Exhibit 1 is the sample of the completed roll of 5,000 pins. Illustrative exhibit 2 is a roll of paper tape. Collective illustrative exhibit 3 consists of a purchase order and four invoices.

Paul G. Lapira testified that he was the controller of the Oakville Division of the Scovill Manufacturing Company, Oakville, Conn., and that during 1960 through 1963, inclusive, he was accounting manager in charge of all accounting and financial components, including control of all purchase orders. Oakville, he stated, manufactures notions and other formed wire and stamped metal parts, including common pins and safety pins.

He testified that the records kept under his supervision disclosed that orders had been received by the Oakville Company, Oakville, Conn., manufacturers of the pins, from the Monarch Marking System Company of Dayton, Ohio, for 117,768 rolls of pins, 5,000 pins to a roll. (Plaintiff's collective illustrative exhibit 3.) Oakville then shipped the pins in bulk to the De Long Hook & Eye Company of St. Mary's, Canada. The De Long Company in Canada inserted the pins into rolls which it prepared. The 117,768 rolls of pins, comprising 23 entries, were then shipped to the United States and entered through the port of Buffalo for the account of the Oakville Company. Of the three entries here under protest, entry number 8949 covers 3,300 rolls, entry number 14198 covers 2,436 rolls, and entry number 21727 covers 4,032 rolls. All of the 117,768 rolls were delivered directly to the Monarch Marking System Company at Dayton. Mr. Lapira also testified that Oakville did not order any work done on the pins *per se* by De Long. Along with the pins, Oakville also sent rolls of paper tape (plaintiff's illustrative exhibit 2) to De Long for use in manufacturing the rolls.

On cross-examination, Mr. Lapira testified that the pins were shipped to Canada in bulk; the paper tape that was shipped was much larger in size than

illustrative exhibit 2, about 17 inches in diameter. The witness stated that the imported pins, as imported on rolls, were used by the ultimate purchaser in the United States, the Monarch Marking System Company, to fasten tags on garments by a special machine for which the rolls of pins were arranged with certain specifications. He also testified that the pins exported to Canada were not from Oakville's open stock, but had been made specially for the Monarch Company to be delivered in rolls such as plaintiff's exhibit 1, and that such rolls had been used as such packaging for 15 years, and in fact had been the only method of packing.

On redirect examination, the witness stated that the rolls of pins manufactured in Canada were designed to fit a special type of machine, not one specific machine, and that this roll was the usual container used by the Monarch Company.

Karl M. Allison, the second witness for the plaintiff, testified that he was vice president and operations manager of the De Long Hook & Eye Company of Canada, Ltd., during the period 1960 to 1963. In that capacity, he supervised the records of the company, including the records of their Canadian imports and exports. He stated that De Long received 86,569 pounds of common pins from the Oakville Company of Oakville, Conn., in bulk in fiber containers, which pins were not mingled with De Long's stock but were kept completely separate. He stated that no work was to be done on the pins. De Long was to package the bulk pins on an inch-wide paper strip (illustrative exhibit 2) which was sent to De Long by the Oakville Company along with the pins in bulk. Illustrative exhibit 2, the roll of paper, originally comes in a larger roll, 17 or 18 inches in diameter. He described the work done under his supervision in the making of the container or paper roll as follows:

The bulk steel common pins were fed to a machine along with the one-inch wide special paper. The machine put two parallel ridges in the paper and at the same time inserted the pins at regular intervals in the paper.

The above operation was continued until 5,000 pins were on the paper strip, the strip was then wound onto a wooden core, and two cardboard discs were stapled to the core (one on each side).

The witness stated that the De Long Company charged 6½ cents for the work of placing the two ridges on sufficient paper tape to make each roll of 5,000 pins, and that the total cost of producing such a roll of 5,000 pins was 19 cents. Mr. Allison further testified that no work was done on the pins themselves. He examined and identified the invoices and entries herein: Entry 8949 of November 13, 1961; entry 14198 of January 30, 1962; and entry 21727 of May 10, 1962. He then stated that his records verified that the pins covered thereby were received from the Oakville Company in Connecticut.

Under cross-examination, Mr. Allison testified that the De Long Company in Canada was a subsidiary of the Oakville Company, and that its business was also the manufacture of notions, wire-form products, metal stampings, and common pins, and that they sold common pins to the retail market, furrier trade, tailoring trade, shirt manufacturers, and marking system companies. Some would be shipped loose in boxes, some stuck in paper.

He then described the exact process which was utilized by his company to complete an item such as exhibit 1 as follows:

The bulk separate pins were fed to a machine. The rolls of one-inch wide tape were fed to the same machine. This machine creased the tape with two parallel creases * * *, the pins being inserted at regular intervals through the two creases in the tape. This is the first operation. The second operation is a 100 percent inspecting operation and winding operation where the tape is wound over the wooden core, inspected, and measured. The third operation is stapling the

cardboard discs to the center wooden core.

The witness stated that a careful spacing of the pins to "a very close tolerance," was required, otherwise the pins would "jam in the De Long's machine as well as in the customer's dispensing machine." Of the printing on the cardboard discs "Made in Canada," the witness stated that it referred only to the cardboard discs and wooden core, which was not specified. The tape which De Long received from Oakville with the pins in bulk, of his own knowledge, was manufactured in the United States, although he never saw the tape manufactured and did not know whether it was produced in any other country.

In concluding his testimony, on questioning by the court, Mr. Allison reiterated that the pins received from Oakville were kept separate from pins of their own manufacture in Canada, and that he knew of his own knowledge that nothing was done, physically or chemically to the bulk pins received in Canada from the United States.

Our first inquiry herein is directed to the portion of paragraph 1615 which states:

> * * * without having been advanced in value or improved in condition by any process of manufacture or other means

and the possible application of the statute to the pins on rolls before us. The preliminary questions are obviated at the outset: first, compliance with customs regulations concerning free entry under the statute was stipulated by the parties; second, concerning the American origin of the pins, it was admitted between the parties and also satisfactorily established by the record that the pins were manufactured in Oakville, Connecticut.

The burden is upon the importer to establish that the value of the American made pins, when returned, had not been advanced in value or improved in condition by any process of manufacture or other means. See United States v. Bird, 11 Ct.Cust.Appls. 229, T.D.

38991. The words "improved in condition" must be taken in a commercial sense and the nature of the commercial entity must be considered. Winthrop-Stearns, Inc. v. United States, 38 Cust.Ct. 1, C.D. 1835; Wilbur G. Hallauer v. United States, 40 CCPA 197, C.A.D. 518.

In Amity Fabrics, Inc. v. United States, 43 Cust.Ct. 64, C.D. 2104, certain velveteen (in pumpkin color) was imported from Italy. The pumpkin-colored velveteen was not selling, whereupon the importer returned it to Italy to have it dyed black, which color was a consistently good seller. On reimportation, the importer claimed free entry under paragraph 1615(a) of the Tariff Act of 1930, as amended, on the ground that the "redyeing did not change the use of the merchandise and that it is offered to the same trade." It was stipulated that the redyeing in no way changed the quality, texture, or character of the material. The cost of redyeing was absorbed by the importer.

In the alternative, if the goods were found dutiable, the importer claimed duty should be assessed only upon the value of the alteration under paragraph 1615(g) of said tariff act, as amended. The court found that the redyeing was an improvement and a change which rendered the fabric marketable, thus advancing it in value or improving its condition, and, therefore, not entitled to free entry under paragraph 1615(a), supra. Concerning the alternative claim, the court held as dutiable only the value of the alteration at the rate which would apply to the article itself, were it dutiable.

It is to be noted here, however, that the redyeing was done on the velveteen *per se*. In the case at bar, nothing was done on the American-made pins *per se*.

In the case of Import Export Service of New Jersey, The Babb Co. v. United States, 37 Cust.Ct. 54, C.D. 1798 (harmonizing with Denike v. United States, 5 Ct. Cust.Appls. 364, T.D. 34553), an American-made aircraft engine was exported to Canada, where it was installed in an airplane of foreign manufacture, which was later imported into the United States.

Testimony showed that the engine was always identifiable by its serial number as one manufactured by Pratt & Whitney at East Hartford, Conn. Installation of the engine required considerable and costly preparatory work. The engine had to be mounted in an engine mounting ring, and, according to the witness, the ring became a part of the airplane, presumably the fuselage. The ring never became a part of the engine itself. The court found that the engine mounting ring and the installation work did not advance the value or improve the condition of the engine *per se* and rejected the theory that the engine when so attached became dutiable with the whole airplane as an entirety, saying (page 56):

> Under paragraph 1615 of the Tariff Act of 1930, as amended, free entry of articles of American manufacture is authorized where such articles have been returned to the United States without having been advanced in value or improved in condition while abroad. Where such articles are returned to the United States in combination with foreign manufactures, the merchandise is not to be assessed with duty as an entirety, but the American goods are entitled to free entry under paragraph 1615 so long as they have not lost their identity as such nor have themselves been advanced in value or improved in condition. Denike v. United States, 5 Ct.Cust.Appls. 364, T.D. 34553; C. J. Tower & Sons v. United States, 33 Cust.Ct. 14, C.D. 1628, and cases there cited.

The defendant cites Winthrop-Stearns, Inc. v. United States, supra, a case which appears closely analogous to the case at bar. In that case, certain Mebaroin tablets manufactured in New York were exported to Canada in bulk. Upon reimportation, they were entered as "Mebaroin Tabs (Medicinal coal Tar products nspf)." They were in no way changed or processed in Canada, but were bottled, 100 tablets to the bottle, and labels affixed. All of the materials used in packaging were of Canadian origin. In such labeled and packaged condition, the tablets were acceptable to the trade in both Canada and the United States.

The issue centered on whether the said tablets, as packaged, were advanced in value or improved in condition, as contemplated within the meaning of these words in paragraph 1615(a), supra. The court denied free entry of the tablets under paragraph 1615(a) as a medicinal preparation derived from a coal-tar product, on the ground that the bottling, labeling, and packaging operations performed in Canada had advanced the value and improved the condition of the merchandise, stating (pages 3-4):

> * * * The articles of commerce imported here are bottles of Mebaroin tablets, labeled, and packed in cardboard containers. Plaintiff has not established that such articles had no greater value than the merchandise in bulk. On the contrary, it is well known that packaged items sell for more than the same articles in bulk. In finding the proper classification applicable to imported merchandise, the actual nature of the commercial entity involved must be taken as the determinant. Donalds Ltd., Inc. v. United States, 32 Cust.Ct. 310, 314, C.D. 1619. In the instant case, it is apparent that the merchandise, a medicinal preparation, was bottled to make it readily available to the ultimate consumer. According to the stipulation, it was acceptable to the trade in its bottled and packaged condition. There is no indication that it was acceptable otherwise. It follows that the merchandise as imported had a greater value commercially or had been improved in condition over the merchandise which was exported.

A case with somewhat similar facts is Lunham & Moore v. United States, 12 Treas.Dec. 218, T.D. 27576. There, bottles of Tabasco sauce, the product of the United States, were shipped to Great Britain, where caps and printed labels were attached and metal sprinklers placed therewith. On their return, the court held that the goods

had been advanced in value or improved in condition and were not entitled to free entry as American goods returned. The decision was affirmed on appeal sub nom. Lunham v. United States, 1 Ct.Cust.Appls. 220, T.D. 31258, on the ground that the regulations had not been complied with, without considering the substantive question.

In connection with a shipment of salmon canned in Alaska, and labeled in Canada with labels printed in the United States, the Treasury Department held that such labeling would advance the value of the merchandise and that the merchandise was not entitled to free entry on the ground that section 554 of the Tariff Act of 1922, which permitted the transportation of merchandise from one port of the United States to another through contiguous foreign territory, did not contemplate that any merchandise thus shipped might be advanced in value or condition while in transit. 49 Treas.Dec. 260, T.D. 41356. The decision states:

> The attorney questions the fact that attaching labels to the cans advances the value of the salmon and on this point he states that:

> There is no improvement in the condition of the commodity itself, but merely an addition of a mark to identify the commodity. Labeling of salmon at Prince Rupert to meet the business requirements of those engaged in the trade of marketing these products of American fisheries does not in any way change the form or condition of the salmon.

> The fact remains, however, that unlabeled salmon or other food products put up in cans or other packages for the retail trade is not salable to the ultimate purchaser unless the packages are labeled. The labels, of course, do not actually advance the value of the product, but labeling renders the goods salable, which they were not before, and hence the commercial value of the goods is advanced.

We note that the respective merchandise in these cited cases, beginning with Mebaroin tablets, a medicinal product (Winthrop-Stearns case), is of a nature distinguishable from the common pins in the case at bar. Donalds Ltd., Inc. v. United States, 32 Cust.Ct. 310, C.D. 1619, involved an inhalant of a medicinal preparation; Lunham & Moore v. United States, 12 Treas.Dec. 218, T.D. 27576, involved Tabasco sauce; the Treasury Department case, identified only as 49 Treas.Dec. 260, T.D. 41356, supra, involved salmon canned in Alaska, labeled in Canada, and shipped to the United States. It is quite obvious that packaging and labeling are essential for distribution and use of these types of merchandise, but not necessarily essential to others. In the latter category, the common pin remains the common pin, recognizable, marketable, and usable, whether packaged and labeled or not. Thus, we distinguish between pills in bottles, or the Tabasco sauce, or the salmon in unlabeled cans, as against the pins on rolls herein. As stated in the Winthrop-Stearns case, supra, (page 3):

> * * * In finding the proper classification applicable to imported merchandise, the actual nature of the commercial entity involved must be taken as the determinant. * * *

In the case at bar, the common pins admittedly, and as proven of record, are of American manufacture. Each and every pin arranged and assembled into the roll of 5,000 is identifiable, and, further, the witness Allison testified that he knew of his own knowledge that nothing was done to change the pins physically or chemically. The record states also that the paper tape is of American manufacture. Accordingly, it is the opinion of this court that the American-made pins herein and the paper tape are entitled to free entry under paragraph 1615(a) of the Tariff Act of 1930, as amended, supra, on the principles expressed in Import Export Service of New Jersey, The Babb Co. v. United States, supra, and the pertinent cases therein cited.

**22**

Plaintiff's claim that the rolls herein are the usual containers and as such are, therefore, entitled to free entry under the same statute, presents a different matter.

 The facts of record make it quite clear that the American-made pins in bulk, in large fiber boxes, and the rolls of paper tape were sent to Canada to be arranged into rolls of 5,000 pins, according to definite specifications. Grooving of the paper tape, insertion of the pins therein to precise spaces, careful inspection, winding the tape with the pins inserted therein onto a wooden core, measuring, counting, and mounting between paper discs, all to fit precisely a machine in Dayton, Ohio, convinces us that the instant roll with the arrangement of the pins thereon is entirely distinguishable from a usual container in the tariff sense. Nor do we consider it to be an unusual container in the tariff sense, requiring classification as a separate article of commerce. We reject the notion that this is a container at all, but instead represents a processing to specifications of the bulk pins, the exact cost of which is established by testimony of record. The witness Allison testified that the processing of two grooves pressed into each roll of 5,000 pins was charged at 6½ cents per roll, and that the *total* charge per roll was 19 cents. Since the 6½ cents per roll is included in the total, we have a definite valuation of 19 cents per roll, which definitely has been added to the pins reimported from the foreign jurisdiction.

Under paragraph 1615(g) (1) of said act, as amended, supra, the imported pins are subject to duty on the value of the said processing done outside the United States. Amity Fabrics, Inc. v. United States, supra.

Based upon the foregoing, we hold that the American-made pins and tape herein are entitled to free entry under paragraph 1615(a), as amended, supra, as American goods returned, not advanced in value or improved in condition.

We hold further that the merchandise herein is subject to duty under paragraph 1615(g) (1), supra, only on the value of the processing done outside the United States at the rate which would apply to the merchandise itself were it not entitled to free entry.

The protest is sustained to the extent indicated. In all other respects it is overruled.

Judgment will be rendered accordingly.

RICHARDSON, Judge, concurs.